FILED '10 AUG 30 11:19 USDC-ORE

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

MARISELA PENA,                                          09-6150-TC

                            Plaintiff,

        v.                                      OPINION AND ORDER

HOUSING AND COMMUNITY SERVICE
AGENCY OF LANE COUNTY, CRAIG
SATEIN, JOHN DEMBOSKY and LARRY
ABLE,

                            Defendants.

COFFIN, Magistrate Judge:

        Defendant Housing and Community Service Agency of Lane County ("Agency") provides

housing and services for moderate to low income Lane County, Oregon residents.  In May 2006,

plaintiff, Marisela Pena ("Pena") applied for an entry level office assistant position at the Agency's

Day Island office.  Pena was bilingual in Spanish and English and had 8 years of office experience

in billing and administrative work.  The Agency hired Pena, and she worked as a receptionist in the

Day Island office until 2009 when she transferred to the receptionist position at the Agency's

Page 1 - OPINION AND ORDER

Fairview office.  In the Spring of 2010, Pena became an assistant property manager, which is an office assistant level position, at the Fairview office, and is still employed there.  Each year of her employment, Pena has received merit raises.  She once received a verbal warning for being tardy, but has not been subject to any formal discipline.  She has never received a negative performance review.

According to Pena, she was disturbed by her co-workers' attitude towards minorities from the start of her employment in 2006.  The person who administered Pena's proficiency in Spanish– who was a University of Oregon employee, told Pena that the Agency required receptionists to be bilingual because "Hispanics are more comfortable seeing their own people."  Pena's co-worker Jane Griffin ("Griffin") hung up on a Hispanic client.  When the client subsequently came to the Day Island office, Griffin used called the client "stupid" and "ignorant" and used profanities to describe her.  On another occasion, Griffin and another co-worker mocked a Middle-Eastern Client, asking, "does he have a towel on his head."  During a training exercise, Griffin created a fictional Agency client who was a Hispanic Panhandler.  Pena asserts that Griffin smirked at her when Pena described the fictional client.  A co-worker wondered aloud during an Agency meeting, "why can't we just give jobs to hard working white people."  Pena also observed Rachel Para, a Hispanic co-worker, being singled out for discipline and disparate treatment.  Pena submitted a declaration in support of a lawsuit that Parra brought against the Agency, and a copy of Pena's declaration was received by Agency Director Larry Able.

Pena's concern about her co-workers' attitude towards minorities continued throughout her employment. Pena states that in May 2009, a Caucasian co-worker stated in the Agency's reception area that the Agency's clients were "bottom feeders."  In July 2009, according to Pena, a co-worker

Page 2 - OPINION AND ORDER

announced that her daughter had just graduated from nursing school and was going to get a job like the rest of the white women. Finally, Pena alleges that, in August 2009, a Caucasian co-worker stated that he was not on the Agency's diversity committee and that "we have enough diversity around here." Pena also believed that Agency supervisors had an anti-minority bias. Pena claims that her supervisor Jill Fields ("Fields") said that a Hispanic applicant, who was ultimately hired, had too heavy of an accent for the front desk. The Agency's housing director, Chuck Hauk ("Hauk") used profanities to refer to the Cuban and African-American directors of other Lane County agencies. Pena contends that Hauk brushed off criticism by another agency director that the Agency did not hire Latinos by saying that "most of them have heavy accents and are not capable of doing the complex jobs." Pena also felt that her supervisors were patronizing and dismissive of Pena's concerns that Caucasian co-workers twice left Hispanic clients waiting for hours in the lobby.

Pena felt that racial bias was specifically directed towards her. Pena's supervisor Fields verbally counseled her and then forced Pena to email her when Pena arrived for work each day after Pena was tardy due to attending to her daughter's illness. According to Pena, she was no later than Caucasian co-workers and Fields did not impose the emailing requirement on other employees. Pena claims that Fields also targeted her by not providing Pena with her yearly reviews, which was in violation of Agency policy. Pena asserts that Agency managers accessed and read her emails without her knowledge. When Pena was assigned tasks outside her work classification, she did not receive out-of-class pay until she complained; even then she received only a 2.5% differential instead of the 5% required by Agency policy. Pena stated that no Caucasian employee received only a 2.5% differential. Pena was offended when Hauk, who was on a diversity committee with Pena, emailed an article to the committee which Pena described as discussing "why NOT to give minorities an

Page 3 - OPINION AND ORDER

edge." Pena felt that the article was directed at her because she raised concerns in a diversity meeting about not being selected for a part-time property manager position. Pena expressed her offense at the article in an email which was sent to Hauk, Agency director Larry Able ("Able"), Agency deputy director Dorothy Cummings ("Cummings"), and Bobby Green. Pena specifically stated that her "chances of being promoted at HACSA are going to be very difficult if this article represents the way that our directors view diverse populations." Pena stated in the email that she was resigning from the diversity committee due to the emailed article. In his deposition, Able stated that after reading Pena's email he believed she had issues with racism or the attitudes towards Hispanics and minorities at the Agency.

Pena's allegations that the Agency did not promote minorities stemmed, at least partly, from her applications for other positions at the Agency. Pena applied for other positions because the receptionist position is not desirable, and Pena viewed other positions as a promotion. The Agency's hiring is controlled by a Collective Bargaining Agreement ("Agreement"). Under the Agreement, the Agency had to first post jobs internally, but, at its sole discretion, could open jobs to outside applicants. In March 2008, the Agency internally posted a part-time property manager position. The hiring panel was entirely Caucasian and chaired by John Dembosky ("Dembosky"). Pena, who had no property manager experience, was the only internal applicant. Before the panel reviewed Pena's application, Cummings–the Agency's deputy director, directed Dembosky to open the position to outside candidates.

The outside posting resulted in 29 applicants. The panel selected 5 applicants, including Pena, for interviews. Pena and 2 others selected for interview were Hispanic. The other two applicants were Caucasian. The interviews included completing 2 math problems, which asked

Page 4 - OPINION AND ORDER

applicants to calculate a subsidized rent payment and, for partial credit, to check boxes indicating

what factors are used to calculate the rent payment–wages, child support. There was a box next

to each calculation question which applicants could check if they did not know how to do the

problem–the "I don't know box." The highest score an applicant could receive on each math

problem was 5, with a total of 10 for both problems.

A Caucasian applicant checked the "I don't know box" on both math questions. She

received scores of 2.5 and 2.5 for a total of 5 from one panelist and scores of 4 and 3 for a total

of 7 from another panelist. These same two committee members gave a Hispanic applicant who

also checked the "I don't know box" scores of 0 and 1. The score of 4 that the Caucasian

applicant received when she checked the "I don't know box" for one of the math problems was

equal to or higher than any score awarded to any of the Hispanic applicants for answers that were

partially or completely correct. Dembosky compiled the applicants' test results and Cummings,

the Agency's deputy director, reviewed them. Cummings notified Dembosky that the results of

the math questions were skewed and, according to Dembosky, directed him to disregard the

panelists' scores to the math questions, substitute his own scores to the math questions instead,

and recalculate the results. Neither the applicants, other panelists, nor the Agency's director,

Larry Able were notified about the scoring issue. During her deposition, Cummings denied that

she noted any anomaly or that she directed Dembosky to recalculate the results.

In June 2008, the Agency internally posted an intake coordinator position. Pena and a

Caucasian co-worker, who had worked for the Agency since 1991, applied. The hiring panel was

entirely Caucasian and chaired by Craig Satein ("Satein"). The panel determined both Pena and

the co-worker were qualified applicants, did not open the position to outside applicants, and

interviewed Pena and the co-worker. Pena received scores ranging from 57 to 105 from the panelists. Pena's average score was 79 and the Caucasian co-worker's averaged scores were 109. The Caucasian co-worker was selected for the position instead of Pena. After the selection, Parra overheard Satein say, "we don't want another Rachel," meaning Rachel Parra who had previously brought a lawsuit against the Agency.

In September 2008, Pena filed a complaint with the Oregon Bureau of Labor and Industries (BOLI), citing an inability for minorities to advance at the Agency. Cummings discussed Pena's allegations with Able, Satein and Dembosky and prepared the Agency's response. Also in September, the Caucasian woman hired for the part-time property manager position resigned after only five months. Pena expressed a strong interest in reapplying for the position. The Agency, however, decided not to hire another property manager and to, instead, create an office assistant position which would support the Agency's property manger. The title of the new position was assistant property manager. Thus, for Pena, who was already in an office assistant receptionist position, the new position would be a transfer rather than a promotion. Although she was disappointed that the position was not a promotion, Pena still applied for it when it was posted.

The day before the Agency had scheduled meetings with Pena and the 2 other applicants, the Agency sent an email stating that it mistakenly believed that it needed to conduct an application process for the job. However, because the position is an office assistant position, there was no need to go through the application process, and the Agency would fill the position through a reassignment of duties. The front desk receptionist at the Agency's Fairview office, who was a new, temporary employee still in her probationary period, was transferred into the

Page 6 - OPINION AND ORDER

assistant property manager position.  Pena states that she was "devastated" that she was not

transferred to the position because she felt it would have allowed her to develop property

manager skills for later promotional opportunities.  Pena sent an email to the Agency's

management expressing her concerns, which she contends was brushed aside.

In November 2009, Pena applied for an administrative assistant 2 position.  Craig Satein

again chaired the hiring panel.  Pena filed this lawsuit in May 2009, and Satein had learned of her

lawsuit in August or September 2009.  Pena and 2 other applicants were scheduled for testing on

excel and a FOXPRO database program.  Pena was the first applicant to take the test, and, as she

was taking it, she noticed a step was missing in the instructions.  Pena spent time trying to

resolve the problem, and was given an extra 15 minutes due to the missing step.  Pena asked

Satein for help with the missing step, and alleges that he declined to correct the problem for her,

but made corrections for the other applicants.

Satein and another supervisor scored the tests.  There was no minimum score that any

applicant had to achieve on the test to advance.  A Caucasian applicant had the highest score, and

Pena had the second highest score.  When the results were announced, the Caucasian applicant

withdrew from consideration.  Instead of hiring Pena, Satein made the decision that she and the

other applicant had not scored high enough to advance in the hiring, and opened the position to

outside applicants.  Pena did not reapply once the position was opened to outside applicants.

During his deposition, Satein stated that there was no minimum score to pass the test, refused to

state what score would have been sufficient for Pena to advance, and stated that because Pena

could not create a graph in Excel, a graphing program, that it was pretty clear that Pena was not

qualified.  Satein further testified at deposition that he had taught other Agency employees to

Page 7 - OPINION AND ORDER

graph in Excel in less than an hour. A Caucasian applicant–who, like Pena, could not create a

graph in Excel, was ultimately hired for the Administrative Assistant 2 position.

     Pena also alleges that in the past 30 years no Hispanic employee at the Agency has ever

been promoted from receptionist to any other position, although the Agency has promoted at

least 15 Caucasian receptionists. All the Agency's Hispanic employees are in maintenance or

entry level office positions. There are no minority managers. Pena now brings claims under

Title VII and ORS 659A.030 and under Oregon law against the Agency; and under 42 U.S.C. §

1983 against individual defendants Craig Satein, John Dembosky, and Larry Able. Presently

before the court is defendants' motion for summary judgment on all of Pena's claims. (Dkt. #

44).

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 allows the granting of summary judgment:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits
> show that there is no genuine issue as to any material fact and that the movant is
> entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). There must be no genuine issue of material fact. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 247-48 (1986).

     The movant has the initial burden of establishing that no genuine issue of material fact

exists or that a material fact essential to the nonmovant's claim is missing. Celotex Corp. v.

Catrett, 477 U.S. 317, 322-24 (1986). Once the movant has met its burden, the burden shifts to

the nonmovant to produce specific evidence to establish a genuine issue of material fact or to

establish the existence of all facts material to the claim. Id.; see also, Bhan v. NME Hosp., Inc.,

929 F.2d 1404, 1409 (9th Cir. 1991); Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210

F.3d 1099, 1105 (9th Cir. 2000).  In order to meet this burden, the nonmovant "may not rely

merely on allegations or denials in its own pleading," but must instead "set out specific facts

showing a genuine issue of fact for trial."  Fed. R. Civ. P. 56(e).

Material facts which preclude entry of summary judgment are those which, under

applicable substantive law, may affect the outcome of the case.  Anderson, 477 U.S. at 248.

Factual disputes are genuine if they "properly can be resolved only by a finder of fact because

they may reasonably be resolved in favor of either party."  Id.  On the other hand, if, after the

court has drawn all reasonable inferences in favor of the nonmovant, "the evidence is merely

colorable, or is not significantly probative," summary judgment may be granted.  Id.

### DISCUSSION

Pena claims she was subject to discrimination under Title VII and Oregon Revised

Statutes § 659A.030 because she was not hired for the January 2008 property manager position,

the May 2008 intake coordinator position, or the November 2009 Administrative Assistant 2

position.  Under Title VII, Pena brings race discrimination, retaliation, and hostile work

environment claims against the Agency.  She brings the same claims plus a disparate impact

claim under Oregon Revised Statutes § 659A.030.  Pena also brings an intentional infliction of

emotional damage claim under Oregon law.

I.     **Jurisdiction**

A.     **Federal Subject Matter Jurisdiction**

To establish federal subject matter jurisdiction over an employment discrimination claim,

a plaintiff must have raised that claim or a claim that is "like or reasonably related" to it in an

administrative action.  Yamaguchi v. United States Dept. of the Air Force, 109 F.3d 1475, 1480

Page 9 - OPINION AND ORDER

(9th Cir. 1997). A court has jurisdiction over allegations of discrimination that either fell within the scope of an administrative action or which <u>can reasonably be expected to grow out of the charge of discrimination.</u>" <u>Id.</u> (internal quotation omitted, emphasis in original).

Defendants argue that this court lacks jurisdiction over Pena's Title VII claim based on her failure to be hired for the Administrative Assistant 2 position because she failed to raise this claim in her EEOC/BOLI complaints. The record establishes that Pena filed her Amended EEOC/BOLI complaint on September 18, 2008 and received her right to sue letter on March 4, 2009–several months before her November 2009 application to the Administrative Assistant 2 position. Thus, allegations of discrimination related to the Agency's failure to hire her for this position are not within the scope of nor reasonably related to Pena's administrative action. I find that I lack subject matter jurisdiction to consider Pena's Title VII claim stemming from the Administrative Assistant 2 position.

### B.    Oregon Tort Claims Act

A party suing a public body is required to give tort claim notice within 180 days of her alleged injury. ORS 30.275(2)(b). The Agency is a public body. ORS 30.260. A claim brought under ORS 659A.030 is a tort claim. <u>Brinkley v. Oregon Health Sciences University</u>, 94 Or. App. 531, 536 (1988). If a plaintiff fails to give timely notice under the Oregon Tort Claims Act, is deprived of her right to bring a claim.

In their memorandum in support of their summary judgment motion, defendants contend that Pena did not give proper tort claim notice for any incident. In her response in opposition, Pena points to a tort claim notice and signed certified receipt card, which is included in exhibits 19-21 (doc. #63-5) to her counsel's declaration. In their response, defendants appear to concede

that Pena has produced a tort claim notice. Accordingly, I find that Pena gave proper notice under the Oregon tort claims act of her state law claims.

## II.    Discrimination Under 42 U.S.C. § 2000e and Or. Rev. Stat. § 659A.030

Title VII prohibits employers from discriminating "against any individual with respect to h is compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer to discriminate against any employee because the employee has opposed an unlawful employment practice or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." Id. at §2000e-3. The Oregon Revised Statutes § 659A.030 was modeled after Title VII, thus Pena's federal and state race discrimination claims can be analyzed together. Hess v. Multnomah County, 216 F.Supp.2d 1140 (D.Or. 2001)(stating tht because ORS Chapter 659A was modeled after Title VII, the legal standards and burdens of proof for discrimination claims are the same).

### A.    Race Discrimination Under Title VII and Chapter 659A

To prevail on a claim of race discrimination, Pena must create a triable issue regarding whether the Agency denied her promotions for which she was otherwise qualified based on her race. To do this, Pena must establish a prima facie case under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). To establish a prima facie case under McDonnell Douglas, Pena must show that: (1) she belongs to a protected class; (2) she applied and was qualified for a position in the Agency; (3) she was subject to an adverse action; and (4) she was treated differently than a similarly situated person who does not belong to the protected class. Id. at 802. The degree of proof necessary to establish a prima facie case is

"minimal and does not even need to rise to the level of a preponderance of the evidence." <u>Wallis v. J.R. Simplot Co.</u>, 26 F.3d 885, 889 (9th Cir. 1994).

Once a plaintiff has established a prima facie case, the burden shifts to the defendant to show a "legitimate non-discriminatory reason for the challenged action." <u>Vasquez v. County of Los Angeles</u>, 349 F.3d 634, 640 (9th Cir. 2003). Pena argues that I should not apply the burden-shifting approach to her Chapter 659A claims; specifically stating that the burden-shifting framework only applies when the state claim is filed or removed to federal court under diversity jurisdiction. I disagree. Federal courts exercising jurisdiction over state law claims apply federal procedural law. <u>Gasperini v. Ctr for Humanities, Inc.</u>, 518 U.S. 415, 426 (1996). Moreover, it is recognized in this district that "[t]he standard for establishing a prima facie case of discrimination under Oregon law is identical to that used under federal law." <u>Villigrana v. Collins Pine Co.</u>, 2008 WL 140723 at *1 (D. Or. Jan. 11, 2008); <u>Tyson v. Or. Anesthesiology Group, P.C.</u>, 2008 WL 2371420 at *6 (D. Or. June 6, 2008)(quoting <u>Snead v. Metropolitan Property Casualty Ins. Co.</u>, 237 F.3d 1080 (9th Cir. 2001).

Once a defendant has met this burden, the plaintiff must then produce evidence that the employer's reason is pretextual. "To satisfy this burden, and survive summary judgment, [plaintiff] must produce enough evidence to allow a reasonable factfinder to conclude <u>either</u>: that the alleged reason for [plaintiff's adverse employment action] was false <u>or</u> that the true reason for [her adverse employment action] was a discriminatory one." <u>Nidds v. Schindler Elevator Corp.</u>, 113 F.3d 912, 918 (9th Cir. 1996)(emphasis in original).

Pena is Hispanic and a member of a protected class. She was subject to an adverse employment action–she was not selected for either the 2008 property manager job or the 2008

Page 12 - OPINION AND ORDER

intake coordinator position. The record establishes that she was qualified for the positions;

otherwise the Agency would not have selected her for interview. Thus, to establish a prima facie

case, Pena only need establish that similarly situated persons who did not belong to the protected

class were treated more favorably than she.

Pena has established that a Caucasian applicant for the 2008 property manager position

was given a score of 4 after checking the "I don't know box" next to a math question. This score

is higher than or equal to the scores Hispanic candidates received for answering the math

question partially or completely correct. Moreover, both the property manager and intake

coordinator positions were ultimately offered to Caucasian applicants. I find that Pena has

established a prima facie case of race discrimination under Title VII and ORS 659A.

The Agency argues that it had legitimate, nondiscriminatory reasons for not hiring Pena

for either position. The Agency states that it hired a Caucasian for the property manager position

instead of Pena because the Caucasian applicant was the more qualified applicant–she had ten

years of property manager experience and Pena had none. The Agency contends that the

Caucasian applicant was hired for the intake coordinator position instead of Pena because that

applicant had been working for the Agency as an office assistant and secretary since 1991 and

because that applicant had scored higher on the exam and interview questions than Pena. In

short, the Agency argues it did not hire Pena for either position because there were other more

qualified applicants; the decision had nothing to do with Pena's race.

Pena argues that the Agency's reasons are pretextual. She points to Cummings's

interjection into the property manager application process and instructing Dembosky to open the

hiring process to all applicants and also to the inconsistences in Cummings's and Dembosky's

Page 13 - OPINION AND ORDER

deposition testimony regarding Cummings's involvement in the hiring process–Dembosky testified that Cummings noticed the math question results were skewed and directed him to recalculate the results; Cummings testified that she did not direct Dembosky to recalculate the results and that nothing stood out to her as an anomaly.  Pena notes that different scores were given to applicants for the property manager position with the same answer on the math problems with the Caucasian applicants getting higher scores.  Pena also observes that the scoring for the intake coordinator position was subjective–one panelists gave Pena a score of 105, but scores in the 50's from the others.  Pena finally points to the Agency's routine practice of promoting Caucasian employees but not Hispanic employees.

   I find that Pena has met her burden and produced evidence that the Agency's proffered reasons for not hiring her are pretextual.  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147 (2000).  The Agency's argument–both in its briefing and at oral argument, that the scoring disparity in the property manager application process was remedied by throwing out the scores, does not establish that there was no bias in the hiring decision.  A reasonable juror could infer that giving a lower score to a Hispanic applicant who answered a question the same way a Caucasian applicant shows racial bias in the Agency's hiring decision.  The disparity in Cummings's and Dembosky's testimony gives rise to a question of fact regarding whether Cummings's actions were motivated by bias which is best left to a jury.  A reasonable juror could conclude that the subjective scoring during the interviews for the intake coordinator position indicates racial bias.  Pena's evidence regarding the promotion of Caucasian employees and not Hispanic employees also creates a disputed issue of material fact regarding racial bias in hiring.  As I noted at the hearing on this motion, there is rarely a smoking gun in employment

discrimination cases. Instead, plaintiffs must rely on circumstantial evidence to make a showing

of race discrimination. I find that here Pena has put forth circumstantial evidence which would

allow a reasonable jury to conclude that there was racial bias in the hiring process for the

property manager and intake coordinator positions. Accordingly, summary judgement on her

Title VII and ORS 659A race discrimination claims is not appropriate.

### B.    Retaliation Under Title VII and Chapter 659A

To survive summary judgment on her Title VII and ORS 659A.030(1)(f) retaliation

claims, Pena must establish that: (1) she engaged in a protected activity; (2) she suffered an

adverse employment action; and (3) there was a causal link between the protected activity and the

adverse employment action. McGinest v. GTE Service Corp., 360 F.3d 1103, 1124 (9th Cir.

2004). To show causation, Pena must show "by a preponderance of the evidence that engaging in

the protected activity was one of the reasons for the [adverse action] and but for such activity the

plaintiff would not have been [subject to the adverse action]." Ruggles v. Cal Polytech State

Univ., 797 F.2d 782, 785 (9th Cir. 1986)(internal quotations omitted). "The causal link may be

established by an inference derived from circumstantial evidence 'such as the employer's

knowledge that the [employee] engaged in protected activities and the proximity in time between

the protected action and the allegedly retaliatory employment decision.'" Jordan v. Clark, 847

F.2d 1368, 1376 (9th Cir. 1988)(internal quotations omitted).

In her Amended Complaint, Pena alleges she was retaliated against for "speaking out

against Defendant HACSA's discriminatory attitude towards Hispanics and HACSA's

discriminatory hiring policies as a member of the HACSA Diversity Committee." (Doc. #31 at ¶

26). She also alleges retaliation "because she testified against HACSA in a racial discrimination

Page 15 - OPINION AND ORDER

complaint..." (Id. at ¶ 27). In her opposition to summary judgment on this claim, Pena concedes that she cannot establish a casual connected between her protected activity and the adverse employment action because she cannot establish that the relevant decision makers were aware of her protected activities. (Doc. #64, at p. 45-46.) Thus, she suggests that "on summary judgment, the relevant conduct is" her September 18, 2008, BOLI/EEOC race discrimination charge and the complaint in the instant case which was filed in May 2009. Id. As the Agency points out, allowing Pena to base her retaliation claims on this conduct would essentially allow her to amend her complaint. Moreover, Pena has not filed an EEOC complaint based on this conduct, meaning the court lacks jurisdiction over a retaliation claim based on that conduct as Pena has not exhausted her administrative remedies. For both those reasons, I decline to substitute the BOLI/EEOC complaint and complaint in this lawsuit as the relevant protected conduct.

Because Pena has conceded that she cannot establish a causal link between the protected activity described in her Amended Complaint and her failure to be hired for the two positions for which she applied, the evidence in the record cannot support a claim of retaliation. The Agency's motion for summary judgment on Pena's Title VII and Chapter 659A retaliation claims is granted.

## C.    Hostile Work Environment Under Title VII and Chapter 659A

To establish a hostile work environment claim under either Title VII or ORS 659A.030, Pena must "establish 'a pattern of ongoing and persistent harassment severe enough to alter the conditions of employment.'" Nichols v. Azteca Restaurant Enter., Inc., 256 F.3d 864, 871 (9th

Page 16 - OPINION AND ORDER

Cir. 2001). The harassment "must be both objectively and subjectively offensive, one that a
reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be
so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1988). Pena must also establish that the
harassment happened due to her membership in a protected class.

When determining whether a workplace is hostile, a court considers all of the
circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is
physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably
interferes with an with an employee's work performance." Harris v. Forklift Sys. Inc., 510 U.S.
17, 23 (1993). "These standards for judging hostility are sufficiently demanding to ensure that
Title VII does not become a 'general civility code.' Properly applied, they will filter out
complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of
abusive language, gender related jokes, and occasional teasing.'" Faragher, 524 U.S. at 788
(internal citations omitted).

Pena's claim for hostile work environment fails because she cannot establish a pattern of
ongoing and persistent harassment severe enough to alter the conditions of employment. The
record establishes that over the course of three years, Agency employees and managers made
several disparaging remarks about minorities. The record, however, also shows that these
remarks were sporadic, isolated incidents; they were spread out over three years–between 2006
and 2009. Many of the comments were either directed towards a different minority group or
directed specifically towards individuals who happened to be minorities. Indeed, the comments
directed towards specific minority individuals were mostly profanities, not racial slurs. Finally,
the remarks are better described as "merely offensive" as opposed to physically threatening or

Page 17 - OPINION AND ORDER

humiliating to Pena. <u>Harris</u>, 510 U.S. at 23. While Pena's co-workers and managers made comments about minorities which were inappropriate and offensive, I cannot find that these isolated comments amounted to a hostile work environment. Therefore, I grant the Agency's motion for summary judgement on Pena's Title VII and Chapter 659A hostile work environment claims.

### D.    <u>Disparate Impact Under Chapter 659A</u>

Oregon Revised Statutes § 659A.030(1)(b) makes it unlawful for an employer to discriminate because of "race, color,...." The Agency argues that the court should grant summary judgment on Pena's disparate impact claim because Pena cannot establish that the Agency's hiring practices have excluded minorities from hiring or promotion.

As mentioned above, ORS 659A.030 was modeled after Title VII, and thus the federal standard for establishing a prima facie case, including the burden shifting frame-work, is used to analyze a disparate impact claim under Oregon law. A claim of disparate impact challenges "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." <u>Int'l Brotherhood of Teamsters v. United States</u>, 431 U.S. 324, 335 n.15 (1977). To establish such, Pena must show a significant disparate impact on a protected class caused by a specific, identified, selection process. <u>Rose v. Wells Fargo & Co.</u>, 902 F.2d 1417, 1424 (9th Cir. 1990); <u>see also</u>, <u>Spurgeon v. Stayton Canning, Co.</u>, 92 Or. App. 566, 570-71 (1988) (stating that disparate impact requires establishing that the plaintiff is a member of a protected class and that the employer's facially neutral employment rule had "the effect of screening out members of the protected class at a significantly higher rate than others.") A prima facie case is "usually

accomplished by statistical evidence showing 'that an employment practice selects members of a

protected class in a proportion smaller than their percentage in the pool of actual applicants.'"

Robinson v. Adams, 847 F.2d 1315, 1318 (9th Cir. 1988).

　　　Pena identifies four Agency employment practices which she alleges caused a disparate

impact: (1) the Agency's practice of not including minorities on hiring panels; (2) the Agency's

practice of not having a minority chair a hiring panel; (3) the subjective grading of interview

questions when race is known to panel members; (4) the subjective grading of math questions

where race is known to panel members. For her statistical evidence, Pena offers that, since 1980,

100% of the 14 Caucasian receptionists have been promoted within the Agency, while 0% of the

7 Hispanic receptionists have been promoted. Further, the Caucasian employees were employed

an average of 26 months before being promoted. On the other hand, Pena has worked for the

Agency for 7 years and has not been promoted. The Agency argues that Pena's statistics are

incorrect, arguing that many Caucasian employees have been employed as office assistants for

longer than Pena. Moreover, the Agency points out that 1 Hispanic employee was promoted

from office assistant to accounting clerk in 1989. Even if 1 out of 7[1] Hispanic employees were

promoted in 7 years, when this percentage is compared to the number of Caucasians

promoted–100%, it appears, at first glance, that Caucasians are promoted at a much higher

percentage than Hispanics. I observe that other courts have recognized that the probative value of

any statistical comparison is limited by a small available sample size. Watson v. Fort Worth

---

　　　[1]In her opposition to summary judgment, Pena lists 6 Hispanic employees, including
herself who have not been promoted. Adding the Hispanic employee who was promoted that
defendants reference (who was identified as a Caucasian promoted in Pena's opposition), this
brings the Hispanic comparator employees to 7. (Dkt. 64 at 26; 28-29).

Page 19 - OPINION AND ORDER

Bank and Trust, 487 U.S. 977, 996-97 (1988) (stating that statistical evidence may not be

probative if it is based on a "small or incomplete data set"); Morita v. Southern Cal. Permanente

Med. Group, 541 F.2d 217, 220 (9th Cir.1976) ("[S]tatistical evidence derived from an extremely

small universe ... has little predictive value and must be disregarded.") (internal quotations

omitted). However, here, the sample size is necessarily limited by the size of the Agency–as the

Agency comparably a small organization so must be the statistical sample of promoted

employees.

 The first step in a statistical analysis is to identify the base population for comparison.

Generally, the appropriate population is the applicant pool or the relevant labor market from

which positions at issue are filled. Here, the base population is the number of receptionists who

have applied for promotion. Receptionists who have not applied for promotion are not a relevant

part of the base population. Based on the record, however, it is not possible to determine

whether all the Hispanics who were not promoted actually applied for promotion. Indeed, based

on the record, it is only certain that 2 Hispanic receptionists–Pena and Maria Cecellia Rojas,

applied for and were denied promotions. (Dkt. 64 at p. 29). A sample size of 2 is far less

compelling than a sample size of 7 who sought, but were denied promotion. Accordingly, I find

that Pena has not produced statistical evidence showing that the Agency's hiring practices have a

disparate impact on Hispanics. I grant summary judgement on Pena's Chapter 659A disparate

impact claim.

### III. 42 U.S.C. § 1983 Claims Against Individual Defendants

 Pena's second claim for relief is a § 1983 claim against individual defendants Craig

Satein, John Dembosky, and Larry Able for violation of her right to due process, equal

protection, and freedom of speech.  Pena alleges that the individual defendants' liability flows not

from any specific action, but from the role each allegedly played in the hiring process for the

property manager and intake coordinator positions.

Through a 42 U.S.C. § 1983 claim, a plaintiff may challenge an action which deprives her

of a federal constitutional or statutory right.  To survive summary judgment on a § 1983 claim, a

plaintiff must establish that the defendant acted with the intent to discriminate.  Satein,

Dembosky  and Able argue that Pena's § 1983 claims must fails because she cannot establish that

any of them intended to discriminate against her.  In the alternative, individual defendants argue

that they are entitled to qualified immunity.

### A.    Qualified Immunity

The first step in a qualified immunity analysis is "to consider the materials submitted in

support of, and in opposition to, summary judgment in order to decide whether a constitutional

right would be violated if all facts are viewed in favor of the party opposing summary judgment."

Jeffers v. Gomez, 267 F.3d 895, 909 (9th Cir. 2001)(citing Saucier v. Katz, 533 U.S. 194, 201

(2001), abrogated on other grounds by, Pearson v. Callahan, __U.S.__, 129 S.Ct. 808, 818

(2009)(holding that while the two step procedure is no longer necessary, district courts are free to

apply it if they wish)).   If no constitutional right would have been violated if the allegations were

proven, then there is no need for further qualified immunity analysis.  Saucier, 533 U.S. at 201.

If a constitutional violation can be established, however, the next step is to consider whether the

right was clearly established.  Id.  This inquiry must be undertaken in the specific context of the

case; it must be clear to a reasonable governmental officer that his conduct was unlawful given

the situation.  Id.  Finally, if the law governing the government official's conduct was clearly

established, the court must inquire whether a reasonable officer could have believed that his conduct was lawful. Jeffers, 267 F.3d at 910.

In order to prevail on a First Amendment claim, Pena must show that the individual defendants took action against her based on her protected speech. Pena concedes in her opposition to summary judgment that she cannot establish that the individual defendants were aware of the protected speech alleged in her Amended Complaint; therefore, Pena will be unable to prevail against individual defendants on this claim regardless of qualified immunity. Summary Judgment is appropriate in favor of individual defendants on this claim.

With respect to the other two claims, I have determined that questions of fact exist regarding discriminatory motives with regard to the 2008 property manager position and the 2008 intake coordinator position. Thus, I cannot conclude that defendants Satein and Dembosky are entitled to qualified immunity. Even if it were ultimately determined that there were other reasons for Pena's failure to be hired for these positions, if the decision not to hire her was based in part on racial animus, these two individuals cannot be said to have acted reasonably. To prevail on her equal protection and due process claims, Pena must show intentional discrimination. In her complaint, Pena does not allege that Able was involved in any way in the hiring for the property manager or intake coordinator position; therefore, Pena will be unable to prevail on these claims against Able regardless of qualified immunity. Defendant Able is dismissed from this action.

### B.   **Due Process**

To survive summary judgment on her due process claim, Pena must show that she: (1) had a constitutionally protected property interest; (2) was deprived of this interest by the

Page 22 - OPINION AND ORDER

government; and (3) was denied process.  Portman v. County of Santa Clara, 995 F.2d 898, 904

(9th Cir. 1993).  To have a property interest, a person must have more than an abstract need,

desire, or unilateral expectation in the interest.  Board of Regents v. Roth, 408 U.S. 564, 577

(1972).  The person instead must have a legitimate claim to the interest.  Id.  In the employment

context, a government employee has a constitutionally protected property interest in continued

employment when the employee has a legitimate claim of entitlement to that position.  Portman,

995 F.2d at 904.  There is no property interest in a promotion.  Nunez v. City of Los Angeles,

147 F.3d 867, 871-72 (9th Cir. 1998).

Pena argues that the Agency's Collective Bargaining Agreement created a property

interest in the jobs for which she applied; specifically that the Agreement required that qualified

in-house candidates be given the first opportunity to interview.  The Agreement, however, only

specifies that positions must first be posted internally; then, at its sole discretion the Agency can

open the positions to outside applicants.  Pena has not established a protected property interest.  I

grant Satein's and Dembosky's motion for summary judgment on this claim.

### C.    Equal Protection

To establish that Satein and Dembosky violated her right to equal protection, Pena must

show a triable issue regarding whether the individual defendants discriminated against her on the

basis of her race.  Intentionally denying an employee a promotion based on the employee's race

violates the equal protection clause.  Bactor v. State of Hawaii, 39 F.2d 1021, 1029 n. 8 (9th Cir.

1994).

At oral argument, I asked Pena's counsel what direct act of defendant Satein violated her

right to equal protection.  Counsel conceded that Satein did not have the power to promote Pena,

Page 23 - OPINION AND ORDER

but that he acted to block her from promotion. Similarly, the evidence in the record does not indicate that Dembosky had the power to promote Pena, therefore, his direct act also must be to have blocked Pena from promotion. I find that the allegation that the individual defendants blocked Pena from promotion is not sufficient to establish a genuine issue of material fact. The record does not establish that either defendant directly acted to thwart Pena's hiring for either position. The record instead shows that Dembosky scored Pena more favorably than other members of the property manager position panel. Moreover, the record indicates that the hiring decision was based on the combined scores of the hiring panels–something which neither Satein nor Dembosky had direct control over.

Pena also points to evidence of racist comments to support her equal protection claim. Craig Satein's statement, which Pena overheard, that "we don't want another Rachel" after rejecting her for the intake coordinator position falls into the category of remarks made in an ambivalent manner that the Ninth Circuit has found insufficient to raise an inference of discriminatory motive. Nesbit v. Pepsico, Inc., 994 F.2d 703, 705 (9th Cir.1993). I grant the individual defendants' motion for summary judgment on Pena's equal protection claim.

**IV.    Intentional Infliction of Emotional Distress under Oregon Law**

Pena's final claim is for intentional infliction of emotional distress (IIED) against the Agency. To establish such a claim, Pena must show: (1) an intent by the Agency to inflict severe emotional distress on her; (2) that the Agency did in fact cause her severe emotional distress; and (3) that the Agency's acts constituted extraordinary transgressions of the bounds of socially tolerable conduct. Checkley v. Boyd, 198 Or. App. 110, 124 (2005).

I find that Pena has not established a claim for IIED. She has not shown that the Agency

Page 24 - OPINION AND ORDER

acted with the intent to inflict severe emotional distress. McGanty v. Staudenraus, 321 Or. 532,

550 (1995). Even assuming arguendo that she had established intent, Pena's claim would still fail

because she cannot show that the Agency's action was outside the bounds of socially acceptable

conduct. As discussed above, the record establishes that over the course of three years co-

workers and supervisors made derogatory comments; some of which were generally directed at

minorities and some of which were specifically directed at minority individuals. The specific

comments were not directed towards Pena and were not racial slurs. See e.g., Williams v. Tri-

County Metropolitan Trans. Dist. of Oregon, 153 Or. App. 686 (1998)(noting that a New Jersey

court had found a single racial slur adequate to support an IIED claim given the especially

injurious nature of the racial insults, coupled with the fact that the slur was made by the chief

executive of the office, who held a special position of power). While the comments alleged in

the record are not acceptable, this conduct is not such that is encompassed in the "extremely

outrageous transgression of social norms" required for an IIED claim. Watte v. Edgar Maeyens,

Jr. M.D. P.C., 112 Or. App. 234, 237 (1992).

### Conclusion

I GRANT defendants' motion for summary judgment on the following claims: (1) Title

VII race discrimination claim against the Agency stemming from Pena's failure to be hired for the

Administrative Assistant 2 position; (2) Title VII retaliation and hostile work environment claims

against the Agency; (3) Chapter 659A disparate impact, retaliation, and hostile work environment

claims against the Agency; (4) 42 U.S.C. § 1983 claims against all individual defendants; and (5)

Intentional Infliction of Emotional Distress claim against the Agency. These claims are

dismissed with prejudice.

Page 25 - OPINION AND ORDER

I DENY defendants' motion for summary judgment on the following claims: (1) Title VII race discrimination claim against the Agency stemming from the property manager and intake coordinator positions; and (2) Chapter 659A race discrimination claim against the Agency stemming from the property manager and intake coordinator positions.

The jury trial date (September 14, 2010) are vacated.  The partes are directed to, within 5 days of the date of this order, advise the court of their availability for a pretrial conference and jury trial in mid-November 2010.  Given that many claims were dismissed on summary judgement, the parties shall advise the court how many days are now needed for the jury trial.


IT IS SO ORDERED

DATED this __30th__ day of August 2010.


_____

THOMAS M. COFFIN
United States Magistrate Judge